THOMAS J. GAYLOR, RESPONDENT, v. LOUIS WEINSHIENK, APPELLANT.[*]

Kansas City Court of Appeals. May 3, 1926.

586

*Corpus Juris-Cyc References: Damages, 17CJ, p. 1091, n. 85; Motor Vehicles, 42CJ, p. 1159, n. 62, 68; p. 1269, n. 25; Trial, 38Cyc, p. 1651, n. 78 New.

*Miles Elliott* and *Duvall & Boyd* for respondent..

*Eastin & McNeely* for appellant.

BLAND, J.—This is an action for damages for personal injuries. Plaintiff recovered a verdict and judgment in the sum of $3500 and defendant has appealed.

The facts show that plaintiff was injured about 1:15 P. M. of July 8, 1924, near the intersection of 11th street and Grand avenue in the City of St. Joseph, by being struck by a Ford truck driven by the agent and employee of the defendant. Grand avenue runs east and west and 11th street north and south; Grand avenue is

paved, 11th street is paved south of Grand avenue but not north of it; 11th street is about thirty feet wide from curb to curb and Grand avenue is five or six feet wider. These streets at the place in question were much traveled, a great many automobiles turning from one street into the other. There was a single street railway track laid on 11th street south of Grand avenue, which terminated at the latter street in a Y used for turning back street cars. The switch point of this Y on 11th street was located about twelve or fifteen feet south of the south curb line of Grand avenue and about six or eight feet south of the south property line of that street.

Plaintiff was employed by the street railway company in greasing curves and adjusting springs in the switches of its tracks. He carried a broom and a grease bucket. There was a "spud" about eighteen inches long on the handle of the broom which he used in cleaning mud out of the curves. He also carried a paddle about two and one-half feet long which he used in greasing curves. Discovering that the spring in the switch point, which was located at the east rail of the track and to the east of the center of the street, needed adjusting he looked down Grand avenue for automobiles and seeing none, knelt down on both knees and started to adjust the burr on the spring. After having remained in this position three or four minutes, intent upon his work, he was struck in the back by defendant's truck. The truck had come from the west on Grand avenue and had turned southwardly into 11th street.

Plaintiff testified that he had done no work prior to the time he was struck except at adjusting the spring; that he did not look again down Grand avenue or look back because "I was busy with the spring;" that he was down on both knees and working with both hands; that it was necessary for him to assume that position to do the work; that the reason he was facing south was that "the burr on the tap was on the inside, it would make me handier to face south so I could use my right hand to tighten the burr;" that the burr was "on the west side of this east rail;" that if he had faced north he would have been required to tighten the burr with his left hand. He testified that he knew that the corner of 11th and Grand avenue was a much traveled street and that many automobiles and other vehicles were present and turning there.

There was a two-story brick building at the southwest corner of Grand avenue and 11th street, standing flush with the property lines of both streets, and a watering trough about thirty feet west of the west curb of Grand avenue and at the south curb of that street. As the driver of the truck approached the intersection there was a horse-drawn vehicle pulling away from the watering trough, going in the same direction, which required the driver of the truck to turn out and around the horse and vehicle and to the north side of Grand

avenue. The approach of the truck from the rear frightened the horse.

The driver of the truck, testifying for the defendant, stated that the occupants of the vehicle stopped the horse "when the horse's head was about even with 11th street on Grand." "Q. Even with the property line on the west side of 11th street? A. Yes, sir." When the horse stopped it was nearly at the center of Grand avenue. The witness testified that when he turned around the corner of 11th street he passed to the left of the center of the intersection and as he went around the corner he was looking at the horse (which was prancing) and buggy and did not see plaintiff until he was two or three feet from him, when his companion in the truck said, "Look out, there is a man." He testified that he looked just as soon as his attention was called to plaintiff. At that time he tried to turn to the east of plaintiff was was unable to do so and struck him. He testified that his truck was going at the rate of about eight or ten miles an hour and that he could have stopped it in not over eight feet and that it was in fact stopped after it struck plaintiff so that plaintiff was under it.

The man who was riding with the driver of the truck, testifying for the defendant, stated that when he first saw plaintiff they were about fifteen feet from him; that the first glimpse he got of plaintiff was "as soon as we turned around the horse;" that when the truck turned it "went a little east of the center" and "went down on the east rail;" that when they were fifteen or twenty feet away from plaintiff, the witness said to the driver of the truck "watch that man, Kinney," (meaning the driver); that there was nothing between the witness and plaintiff to obstruct the witness's view. The witness was on the right-hand side of the seat and the driver was on the left. After the collision he found plaintiff's tools at the switch box. This witness, as well as the driver of the truck, did not remember whether any horn was sounded but there was other testimony that no warning of the approach of the truck was given to plaintiff.

There was evidence that the head of the horse was six or eight feet west of the west property line of 11th street when the truck "cut around in front" of the driver of the vehicle and that when the truck turned on 11th street it was running at the rate of speed of from thirty to thirty-five miles an hour.

Defendant makes the point that the court erred in refusing to give instruction D in the nature of a demurrer to the evidence. This point is based upon the contention that plaintiff was guilty of contributory negligence as a matter of law, defendant pointing out that the case was submitted to the jury by plaintiff upon the straight negligence theory, the latter having abandoned the humanitarian theory which was pleaded in the petition along with the other theory. Defendant

argues that plaintiff placed himself approximately in the center of a much traveled street, knowing that automobiles and other vehicles would be coming around the corner from the west into 11th street, with the view of the drivers thereof obstructed by reason of the two-story brick building flush with the property lines at the southwest corner of the intersection, without again looking or having done anything to warn drivers of such vehicles that would necessarily approach him.

This argument is one that could have been properly directed to the attention of the jury but is not one for this court. It is apparent that plaintiff was not guilty of contributory negligence as a matter of law. The care required of a laborer who is engrossed in his duties on that part of the street used by vehicles is not to be determined by the same rules that are applicable to an ordinary pedestrian. "He is not negligent, while not moving about, because he becomes engrossed in his work and does not look about or listen for approaching vehicles. He is not called upon to exercise the same diligence in avoiding accidents as pedestrians or others who use the street merely as a medium of locomotion." [Berry on Automobiles (4 Ed.), sec. 532, p. 474. See, also, Dube v. Storage Co., 236 Mass. 488, 492; Cecola v. Cigar Co., 253 Penn St. 623; Ostermeier v. Implement Co., 255 Mo. 128; Nehring v. Chas. M. Monroe Stationery Co., 191 S. W. 1054.] He was required to exercise only that degree of care that a reasonably prudent person under the circumstances would exercise and he could rely to some extent on the assumption that the drivers of automobiles would not come from around the corner in such a way as not to be able, after the appearance of danger, to take any action to avert a collision. It will also be borne in mind that plaintiff was not on the side of 11th street where vehicles turning into 11th street, southward bound, were expected to be. The law required these to proceed on the right side of the street. We have examined defendant's authorities and find them not in point.

Aside from what we have said, there is nothing suggested that plaintiff could have done to warn drivers of cars approaching from the west on Grand avenue, intending to turn into 11th street, except that he might have placed his grease bucket or laid his broom "out toward Grand avenue." If the driver of the truck could not see an object as large as a man kneeling down in the street, he could not have seen the things that defendant suggests plaintiff should have put out in the street as a warning, unless the latter placed them so far away that they would not have indicated the purpose for which they had been deposited in the street and would not have constituted any warning. In addition, had plaintiff done as suggested he would have placed an obstruction in the street that might have resulted in a suit against him by someone being injured as the result thereof.

Of course, we do not intend to hold that there was any duty as a matter of law upon plaintiff to have given a warning of any kind of his situation.

Complaint is made of the refusal of the court to give defendant's instruction B, which sought to tell the jury that plaintiff was under the duty to exercise reasonable care to see approaching vehicles and that if they found that "if he had exercised such reasonable care, he could have seen defendant's car approaching in time to avoid being struck, you will find for defendant, even though you may believe from the evidence that defendant's driver in charge of said car, if you so find, was guilty of negligence." It will be noted that the instruction does not leave it to the jury to say whether plaintiff as a man of reasonable prudence should have looked for an approaching car under the circumstances, but tells them, in effect, even though he was down on his hands and knees engrossed in a work that required his attention, that it was his duty to look for a possible approaching car in a reasonably careful manner, and if by so looking he could have seen defendant's car approaching, he could not recover. Of course, even though plaintiff is not to be viewed in the same light as a pedestrian he was required to use ordinary care, but for the court to have instructed the jury that such care required him under the circumstances to look for a possible approaching automobile, would have been erroneous. [Nehring v. Stationery Co., supra, 1. c. 1055.] It was for the jury to say under the circumstances whether he should have done this.

Complaint is made of the court's refusal to give defendant's instruction C, which sought to have the jury find that the streets at the point in question were much traveled, that the building at the southwest corner of the intersection was an obstruction and that if plaintiff "knowing the situation, . . . took said position and took no precaution to warn the drivers of approaching vehicles of his position, the plaintiff was guilty of contributory negligence and cannot recover in this case." From what we have said, there was no error in the refusal of this instruction.

It is insisted that the verdict is excessive. The facts in this connection show that plaintiff when struck was rendered stunned or unconscious and remained in this condition until after an ambulance was called and he was taken to a hospital and then removed to a second one. The nurse at the latter hospital testified, "When he was brought there he was practically unconscious;" that his chest was there strapped with adhesives and that "he was unable to move himself for the first few days;" that it required two or three nurses to turn him over because he was unable to "help himself and he was in great pain." He remained in this hospital about two weeks and was able to sit up the last week. He was taken to his home in a taxi-

cab and there remained confined to the house until the 27th or 28th of August, when he went to work. Plaintiff testified that he suffered pain in his ribs and chest and in his hip, back and chest, and that "it was in my chest and my ribs and my back was wrenched and I suffered awful pain in my ribs and chest . . . my legs were pretty badly bruised" below and above the knee. At the time of the trial the injuries other than to his chest and ribs seem to have mended but he still suffered pain on the left side of his chest and ribs.

About the 27th or 28th of August he mowed a lawn and mowed several lawns after that. Prior to September 3, he assisted in building a concrete sidewalk. This work consisted in digging a trench by shoveling for a sidewalk and in using a wheel barrow. On the 3rd of September he went to work in a brick yard shoveling shale into a crusher and continued doing this work until December. After that he went to work at the Grain Belt Mills, shoveling grain and dumping grain into elevators, etc. But all of the time that he was working he was in pain. There was testimony that before he was hurt he was an active man but since that time "he has not been nearly so active;" "he does not get around nearly so lively any more." At the time of the trial, which was on March 11, 1925, he was thirty-six years of age. After going to work he continued to call upon his physician in reference to his injuries, two or three times a month.

Dr. Walker testified that he first saw plaintiff at his home prior to August 27, and at that time plaintiff was wearing an adhesive plaster around his side; that his complaint was that his back was hurting him and that he had a great deal of pain in his chest. On an examination he found plaintiff had evidence of a "severe twist in the pelvic region . . . that is, the lower part where the pelvis and the spine are joined together, twists and strain there." That the fifth and sixth ribs on the right side were fractured and possibly the fourth and that he allowed the adhesive plaster to remain because "that would be the proper treatment for that kind of injury;" that plaintiff "had quite a bit of nervous shock and shock to the entire spine as well." The doctor testified that he continued to see plaintiff until the trial and that two or three days before the trial he made an examination of him and found that he had made "some very good improvements;" that—

"He still has evidence of the injury in the pelvis and the lower part of the spine and the rib lesion here (indicating). The ribs are still out of line and they are not in perfect alignment and also show a good deal of tenderness.

"Q. You say rib, tell us what part of the body you mean: A. The angle of the ribs around the left side and at the junction of the ribs with the cartilage of the breast bone. It seems they are in-

592

jured, overbalanced, at that point and that throws them a little bit out of line.

"Q. State whether or not an injury such as you have described is painful. A. It is painful.

"Q. What do you say as to whether or not plaintiff's injuries are permanent or temporary? A. He will have some permanent injury there. It is almost impossible to restore such conditions back to a normal condition to that a man not suffer from it and have some pain from it at different times in his life. And also the one down lower in his spine, it really leaves it weak at that point. I think he has complained less of that than he has to the rib lesions.

"Q. What do you say as to his spine as to whether or not it is permanent or temporary? A. It is permanent. It leaves a weak area.

"Q. Tell the jury what way it will bother him as long as he lives and in what way it will incapacitate him from doing his usual work? A. There are many different ways in which this will affect him. He might get along without having a great deal of trouble with it and on the other hand, he may have considerable. Neuritis there in the intercostal nerves or down in the lower·spine which we call lumbago or sciatic neuritis, those, I think, would be the most likely troubles he would have there and sometimes he would get a catch in his back. Those are conditions which result from weak point. The rib lesions would produce more or less pain in his side, so called pleurisy pains or intercostal neuritis and of course, it is likely to affect the lungs or heart through those."

Under the circumstances we do not think that the verdict is so great as to justify us in interfering with it.

The judgment is affirmed. *Arnold, J.,* concurs; *Trimble, P. J.,* absent.